UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 8, 2018

------------------------------------------------------------------X
                                         :
                                         :
                                         :
IN RE NISSAN LITIGATION                   :            17-cv-729 (KBF)
                                         :
                                         :          OPINION & ORDER
                                         :
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Since this case was removed from state court in January 2017, it has generated countless motions, a mountain of briefing, protective orders, and 454 entries on the docket. At the end of the day, however, this case is a straight-forward breach of contract claim.

The original complaint in this action was filed by Acim NY, LLC d/b/a Nissan of Manhattan ("Acim"), Alim NY, LLC d/b/a Infiniti of Manhattan ("Alim"), and Bicom NY, LLC, d/b/a Jaguar Land Rover Manhattan ("Bicom"), who brought suit against Nissan North America, Inc. ("NNA") and Nissan Motor Acceptance Corp. ("NMAC") (collectively, "Nissan") for breach of contract in state court. The dealerships claimed that Nissan had embarked on a pattern of bad faith, whereby the dealerships were set up from the beginning to fail.

Nissan in turn filed counterclaims against Acim, Alim, and several third-party defendant dealerships and owners, claiming that the dealerships and their guarantors were in default on certain loan obligations to Nissan—and due to a

series of cross-guaranties that the Dealerships and their owners had signed, in default on all of their obligations.

NMAC has now moved for summary judgment on Counts Four, Six, and Seven of its Amended Counterclaim—Breach of Guaranty, Damages, and Foreclosure.[1]

For the reasons set forth below, the Court GRANTS the motion.

## I.   FACTUAL BACKGROUND

### A.  Factual Background

The following facts are materially undisputed and all inferences are drawn in favor of the plaintiff.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Helpful to the analysis that will follow is a brief introduction of the relevant players and certain concepts specific to car dealerships and their financing methods.

### 1. Plaintiffs and Third-Party Defendants

Plaintiffs and third-party defendants are car dealerships and their owners, managers, and guarantors.  The dealerships are: Alim, Acim, White Plains Auto Company, LLC, d/b/a White Plains Nissan ("WP"), and MTKN, LLC, d/b/a Nissan of Mt. Kisco ("MTKN") (collectively, "the Dealerships").  BNF Partners NY, LLC ("BNF") and BNF NY Realty, LLC ("BNF Realty") are the umbrella partnerships affiliated with all four dealerships.  Bicom is another affiliated dealership, and was also a Guarantor.

---

[1] NMAC has also withdrawn as moot all other counts of the Amended Counterclaim; therefore, this motion seeks to resolve all remaining claims.

BNF is comprised of three partners: third-party defendants Gary Flom (the principal owner), Veniamin Nilva, and Alexander Boyko (who hold minority ownership interests).

### 2. Defendants

NNA sells both Nissan and Infiniti vehicles to franchised Nissan and Infiniti dealers throughout the United States; NMAC operates as its captive finance arm. NMAC provides "wholesale" or "floor plan financing," whereby it establishes wholesale credit lines and provides purchaser money financing to allow dealers to acquire in-store inventory for retail sale to the public.

### 3. Floor Plan Financing/Sales "Out of Trust"

In order to keep inventory in their dealerships, car dealers typically enter into Floor Plan Financing agreements with the captive finance arms of the manufacturers—in this case, with NMAC. Under such agreements, funds are advanced from time to time and must be repaid at certain intervals. Anytime property is sold, however, the dealer is required to pay the manufacturer whatever amount is associated with that property. In this case, NMAC's agreements with the dealers required the following: "Upon any Disposition of Property, Dealer shall promptly pay NMAC the amount due related to the item sold, together with interest, in accordance with NMAC's Wholesale Floor Plan Payoff Policy." (See, e.g., ECF No. 394-22 § 2.32.)

When a dealer sells a vehicle without prompt payment as agreed under their Floor Plan Financing Agreement, it is known as selling a vehicle "out of trust."

4. <u>Formation of the Dealerships</u>

In November 2015, Nissan and plaintiffs entered into a series of agreements to establish and build new Nissan and Infiniti dealerships in Manhattan—these agreements included wholesale finance and security agreements with NMAC (WSAs) that provided floorplan financing. (ECF Nos. 394-2, 394-10.)[2]

In December 2015, Nissan and MTKN partnered to open a dealership in Mount Kisco, New York.  NMAC and MTKN subsequently entered into another WSA.  (ECF No. 394-17.)

The WSAs all provide as follows:

- <u>Section 2.3.2</u> requires the dealer to repay NMAC's floorplan loan upon the retail sale of a vehicle.

- <u>Section 5.1.1</u> states that the failure to comply with Section 2.3.2—or, as it is commonly known, selling a vehicle "out of trust"—constitutes an act of default under the WSAs.

- <u>Section 5.2</u> states that "whenever a default occurs, or at any time after a default has occurred, NMAC at its option and without demand or notice of any kind, may suspend Dealer's financing of one or more lines under this Agreement and/or terminate this Agreement and declare the Indebtedness to be immediately due and payable."

(ECF Nos. 394-2, 394-10, 394-17, 394-22.)

---

[2] Nissan had already entered into a similar agreement with White Plains in October 2014. (ECF No. 394-22.)

In addition to the WSAs, NMAC and plaintiffs entered into various working capital and mortgage loans and revolving lines of credit in order to construct the new premises.   The Court will quickly detail the various arrangements below.

First, NMAC extended three Revolving Credit and Security Agreements ("RLOCs")—a $2 million line of credit to Acim dated December 4, 2015, a $6 million line of credit also to Acim also dated December 4, 2015, and a $7 million line of credit to Alim dated October 7, 2016.  (ECF Nos. 394-3, 394-11, 394-12.)  For all three RLOCs, events of default included, <u>inter alia</u>, Borrower's failure to perform under any Loan Document, or termination of wholesale financing under the WSA. (<u>Id.</u> §§ 7.1(b), 7.1(l).)

Second, NMAC granted Alim a $3 million term loan by means of a Capital Loan and Security Agreement dated July 20, 2016.  (ECF No. 394-4.)  The loan was secured by the Dealers' collateral.  Events of default included, <u>inter alia</u>, default of any guarantor under any credit agreement with NMAC, and/or termination of Wholesale Financing Agreement.  (<u>Id.</u> §§ VI(A)(7), VI(A)(10).)

Third, NMAC granted BNF Realty a $12,188,500 loan for WP.  In exchange, BNF Realty gave NMAC a Promissory Note dated October 7, 2016 (ECF No. 394-28) and secured by a mortgage on a property in Tarrytown, New York.  Events of default included, <u>inter alia</u>, an occurrence of an event of default under the Mortgage or any other Loan Document, termination of the Wholesale Financing Agreement, and/or failure of the Guarantor to perform any obligation under any Guaranty.  (<u>Id.</u> §§ 3.1(e), 3.1(l), 3.1(n).)

In addition, Flom, Nilva, Boyko, and BNF Partners (collectively, "the Guarantors") signed Continuing Guaranty agreements to induce NMAC to extend credit to the Dealerships, guaranteeing the "full and prompt performance and payment of all present and future liabilities of Dealer to Lender irrespective of their nature or the time they arise." (ECF Nos. 394-5, 394-6, 394-7, 394-9, 394-13, 394-14, 394-15, 394-18, 394-19, 394-20, 394-24, 394-25, 394-26.) In relevant part, the guaranties all state as follows:

> The obligations of Guarantor under this Guaranty shall be <u>continuing, absolute and unconditional</u> under any and all circumstances and shall be paid by Guarantor regardless of . . . any defense, offset, or counterclaim which may at any time be available to or be asserted by Dealer or Guarantor . . . .

(<u>Id.</u> at 2) (eI'mphasis added).

The Continuing Guaranties further state that:

> Guarantor's execution of this guaranty was not based upon any facts or materials provide by lender nor was guarantor induced to execute this guaranty by any representation, statement or analysis made by lender.

(<u>Id.</u> at 5.)

On October 7, 2016, the Guarantors also executed a Guaranty Agreement to induce NMAC to extend the $12.1 million loan to BNF Realty. (ECF No. 394-30.) Section 4 of that agreement provided that Guarantor waived all defenses and counterclaims. In Section 5, the Guarantor "authorizes Lender, at its sole option, without notice or demand and without affecting liability of Guarantor under this Guaranty, to foreclose any or all of the mortgages and interests in real property

secured thereby by nonjudicial sale, or to exercise any right or remedy with respect to the Mortgage or the property covered thereby."

Finally, the Dealers and Guarantors entered into a series of Cross-Guaranty Agreements between December 4, 2015, and October 7, 2016, each of which amended the previous agreement.  (ECF Nos. 395-32, 395-33, 395-34, 395-35, 394-36.) The final such Cross-Guaranty was executed by the following Borrowers: BNF Realty, WP, Acim, Alim, and MTKN, and the following Guarantors: Bicom, BNF Partners, WP, Flom, Nilva, and Boyko.[3]  (ECF No. 394-36.)

Attached to the cross-guaranties were schedules detailing plaintiffs' debt to defendants. The cross-guaranties contain the following relevant provisions:

- <u>Section 1</u> (Acknowledgement of Debt):  Borrowers and Guarantors hereby acknowledge, confirm and declare that on the date hereof, all amounts owing, as such amounts may be increased or modified from time to time, under all of the Loan Documents identified on Schedule A attached hereto, are unconditionally due and owing by each Borrower to Lender without any set off, deduction, counterclaim or defense of any kind or nature to the payment thereof.[4]

---

[3] The fourth amended and restated cross-guaranty, cross-collateral, and cross-default agreement was not signed by Alexander Boyko.  Boyko's signature, however, appears on all previous cross-guaranties.  In response to this motion, he argues that he was often given blank signature pages unattached to the cross-guaranties.  This argument is unavailing.  Under New York law, "one who signs a note with obvious blanks is liable to a holder in due course of the note, according to the terms of the note after the blanks have been filled."  <u>Indem. Ins. Co. of N. America v. Am. Deseret Ltd. P'ship</u>, 887 F. Supp. 521, 530 (S.D.N.Y. 1993).

[4] There was a Schedule A attached to each cross-guaranty.  The Schedule A attached to the Fourth Amended (most recent) guaranty, detailed the debt as follows:
   A.  WHITE PLAINS AUTO COMPANY, LLC

1. Automotive Wholesale Financing and Security Agreement between WHITE PLAINS AUTO COMPANY, LLC and Lender, dated October 9, 2014.
2. Continuing Guaranty Agreement of GARY B. FLOM in favor of Lender, dated as October 9, 2014.
3. Continuing Guaranty Agreement of VENIAMIN NILVA in favor of Lender, dated as October 9, 2014.
4. Continuing Guaranty Agreement of ALEXANDER BOYKO in favor of Lender, dated as October 9, 2014.
5. $100,000 Lease Plan Financing and Security Agreement between WHITE PLAINS AUTO COMPANY, LLC, and Lender, dated October 9, 2014.

B. ACIM NY, LLC
1. Automotive Wholesale Financing and Security Agreement between ACIM NY, LLC and Lender, dated December 4, 2015.
2. Continuing Guaranty Agreement of GARY B. FLOM in favor of Lender, dated as December 4, 2015.
3. Continuing Guaranty Agreement of VENIAMIN NILVA in favor of Lender, dated as December 4, 2015.
4. Continuing Guaranty Agreement of ALEXANDER BOYKO in favor of Lender, dated as December 4, 2015.
5. $8,000,000 Revolving Credit and Security Agreement between ACIM NY, LLC, and Lender, dated December 4, 2015.

C. ALIM NY, LLC
1. Automotive Wholesale Financing and Security Agreement between ALIM NY, LLC and Lender, dated December 4, 2015.
2. Continuing Guaranty Agreement of GARY B. FLOM in favor of Lender, dated as December 4, 2015.
3. Continuing Guaranty Agreement of VENIAMIN NILVA in favor of Lender, dated as December 4, 2015.
4. Continuing Guaranty Agreement of ALEXANDER BOYKO in favor of Lender, dated as December 4, 2015.
5. $3,000,000 Capital Loan and Security Agreement between ALIM NY, LLC, and Lender, dated as of July 20, 2016.
6. $7,000,000 Revolving Credit and Security Agreement between ALIM NY, LLC, and Lender dated _____, 2016.
7. Continuing Guaranty Agreement of BICOM NY, LLC in favor of Lender, dated as _____, 2016.
8. Continuing Guaranty Agreement of BNF PARTNERS NY, LLC in favor of Lender, dates as _____, 2016.

D. MTKN, LLC
1. Automotive Wholesale Financing and Security Agreement between MTKN, LLC and Lender, dated December 17, 2015.
2. Continuing Guaranty Agreement of GARY B. FLOM in favor of Lender, dated as December 17, 2015.
3. Continuing Guaranty Agreement of VENIAMIN NILVA in favor of Lender, dated as December 17, 2015.
4. Continuing Guaranty Agreement of ALEXANDER BOYKO in favor of Lender, dated as December 17, 2015.

E. BNF NY REALTY, LLC
1. $12,188,500.00 Promissory Note executed by BNF NY REALTY, LLC in favor of Lender, dated October 7, 2016.
2. Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing executed by BNF NY REALTY, LLC in favor Lender, dated October 7, 2016.

- <u>Section 4</u> (Cross Collateralization):  Each Borrower hereby agrees that the Loan Documents to which it is a party and the collateral security described therein shall secure the obligations of the other Borrowers under the Loan Documents and under this Agreement . . .

- <u>Section 5</u> (Cross Default):  The occurrence of one default under any one of the Loan Documents shall constitute a default under each other Loan Document, entitling Lender to exercise any of its rights and remedies under any or all of the Loan Documents . . .

In addition, in Section 7, the "Guarantors expressly reaffirm all of their obligations under their Guaranties and agree that their Guaranties include each provision set forth in Schedule B attached to this Agreement."[5]  Included among those provisions was that "[t]he obligations of Guarantor under the Guaranties shall be continuing, absolute, and unconditional under any and all circumstances." Finally, in Section 8, the Borrowers and Guarantors represented that they had "voluntarily and without coercion or duress of any kind entered into this Agreement and the documents executed in connection with this Agreement."

---

3.  Guaranty of WHITE PLAINS AUTO COMPANY, LLC, GARY B. FLOM, an individual, VENIAMIN NILVA, ALEXANDER BOYKO, jointly and severally, in favor of Lender, dated October 7, 2016.

4.  Guaranty of BICOM NY, LLC, and BNF PARTNERS NY, LLC, jointly and severally, in favor of Lender, dated October 7, 2016.

[5] Attached as the Schedule B are all continuing Guaranty provisions.

5. <u>Default</u>

In 2016, the dealerships went into default by selling vehicles "out of trust."[6] NMAC issued notices of default and allowed an opportunity to cure the default. (ECF Nos. 395-5 and 395-6).  When the defaults were not cured pursuant to Section 5.2 of the WSAs, NMAC terminated its wholesale financing agreements.

B. <u>Procedural Background</u>

On January 20, 2017, Acim, Alim, and Bicom filed suit in state court against NNA and NMAC for breach of contract and seeking damages and temporary and permanent injunctions enjoining and restraining NNA from terminating the Dealer Agreements and Sublease that the plaintiffs and defendants had previously entered into.  (ECF No. 1.)  At the same time, they filed a motion for a temporary restraining order and preliminary injunction.  Defendants removed the action to this Court on January 31, 2017.  (<u>Id.</u>)

On February 28, 2017, Judge Laura T. Swain denied plaintiff's motion for a temporary restraining order and preliminary injunction. She based her ruling on, <u>inter alia</u>, a determination that plaintiffs, who were insolvent, lacked any means to cure the default aside from vacating the premises.[7]  (ECF No. 54.)

---

[6] There is vigorous debate regarding the number of vehicles that were sold out of trust, whether Dealerships sold out of trust at defendants' request, and when defendants first became aware that the vehicles were sold out of trust.  It is, however, undisputed that by the fall of 2016 at least <u>some</u> vehicles in WP were sold out of trust.

[7] Judge Swain also found, as a matter of fact, that the dealerships had sold vehicles out of trust; the Court does not here rely upon that finding, however, as the factual findings of law made by the District Court granting a preliminary injunction are not binding in subsequent proceedings before the Court.  <u>See, e.g.</u>, <u>Irish Lesbian & Gay Org. v. Giuliani</u>, 143 F.3d 638, 644 (2d Cir. 1998).

On March 3, 2017, NMAC filed its answer and counterclaim, naming BNF Realty, BNF, WP, Boyko, Flom, and Nilva as third-party defendants. (ECF No. 69.) NNA filed its answer and counterclaim on March 8, 2017, also naming all of the above as third-party defendants. (ECF No. 74.)

The Court will not here detail the complex procedural history of the case over the next several months—except to note that what followed was a Byzantine series of show cause hearings, interlocutory appeals, findings of contempt, and granting of contempt sanctions.

The case was transferred to the undersigned on September 11, 2017. On October 7, 2017 and October 8, 2017, respectively, NNA and NMAC filed amended complaints and counterclaims, with leave from the Court. On December 1, 2017, the Court held a status conference at which it granted NNA and NMAC's motions to strike plaintiffs' amended counterclaims and answers (ECF Nos. 362 and 363), finding both that they were untimely filed and also that they constituted an impermissible attempt by plaintiffs to add significant new scope to the case.[8]

---

[8] Plaintiffs incorrectly assert that the Court struck only the new counterclaims at the December 1, 2017 conference. The Court struck ECF Nos. 362 and 363 in their entirety—rather than selectively striking only some parts of those filings. While the Court acknowledges that it referred to the "counterclaims or cross claims or however they are characterized," it also took time to address the untimely nature of the filing and it granted the motion as presented—which was to strike both documents. Had the Court intended to strike only portions therein, it would certainly have affirmatively indicated so.

At that same status conference, the Court awarded defendants $201,947.03 in satisfaction of an Order of Contempt previously issued by Judge Swain.[9]  (ECF No. 193.)

## II.    LEGAL PRINCIPLES

### A.  Summary Judgment

Summary Judgment may not be granted unless a movant shows, based on admissible record evidence, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322–23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a

---

[9] Judge Swain found Alim, WP, and Flom to be in contempt of her Order of April 21, 2017, which directed the Dealers to return a number of vehicles to NMAC, and further granted contempt sanctions against Alim, WP, and Flom.

genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir.

2009).  "A party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," as "mere

conclusory allegations or denials cannot by themselves create a genuine issue of

material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159,

166 (2d Cir. 2010) (internal quotation marks, citations, and alterations omitted).  In

addition, "only admissible evidence need be considered by the trial court in ruling

on a motion for summary judgment."  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir.

2013) (internal quotation marks, citations, and alterations omitted).

     B. Unconditional Guaranties

"To obtain summary judgment to enforce a written guaranty, 'all that the

creditor need prove is an absolute and unconditional guaranty, the underlying debt,

and the guarantor's failure to perform under the guaranty.'"  136 Field Point Circle

Holding Co., LLC v. Invar Int'l Holding, Inc., 644 Fed App'x 10, 11–12 (2d Cir. 2016)

(quoting City of New York v. Clarose Cinema Corp., 256 A.D.2d 69, 71 (N.Y. App.

Div. 1998)).

"'[B]road, sweeping and unequivocal language' in an absolute and

unconditional guaranty generally 'forecloses any challenge to the enforceability and

validity of the documents which establish defendant's liability for payments arising

under the [underlying] agreement, as well as to any other possible defense to his

liability for the obligations.'"  136 Field Point Circle, 644 Fed App'x at 12 (quoting

Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro, 36 N.E.3d 80, 86

(N.Y. 2015).  "Absolute and unconditional guaranties have in fact been found to preclude guarantors from asserting a broad range of defenses under New York law." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 35 (2d Cir. 1999).

More specifically, where a guaranty provides that it is "'absolute and unconditional irrespective of . . . any lack of validity or enforceability of the agreement . . . or . . . any other circumstance which might otherwise constitute a defense,' the guarantor is precluded from asserting a defense as to the 'existence of a valid underlying debt.'" 136 Field Point Holding, 644 Fed. App'x at 12 (quoting Cooperatieve Centrale, 36 N.E.3d at 86–87).  This has been specifically and consistently applied to all defenses, including fraudulent inducement.  See, e.g., Cooperatieve Centrale, 36 N.E.3d at 85 ("This Court has acknowledged the application of these absolute guaranties even to claims of fraudulent inducement in the execution of the guaranty."); Citibank, N.A. v. Plapinger, 485 N.E.2d 974, 977 (N.Y. 1985) (holding same).  This is particularly true when all parties to the guaranty are "sophisticated business people" who have "hammered out . . . a multimillion dollar personal guarantee."  Citibank, 485 N.E.2d at 977.

C.  Right to Foreclosure at Summary Judgment

In New York, a plaintiff establishes a prima facie right to foreclosure by producing: 1) the mortgage documents; and 2) undisputed evidence of nonpayment. See United States v. Freidus, 769 F. Supp. 1266, 1277 (S.D.N.Y. 1991).  Only an affirmative showing by the defendant can overcome this presumption.  See Regency

14

<u>Sav. Bank, F.S.B. v Merritt Park Lands Assocs.</u>, 139 F. Supp. 2d 462, 465–66 (S.D.N.Y. 2001).

## III.   DISCUSSION

NMAC moves for summary judgment on Counts Four, Six, and Seven of its Amended Complaint, arguing that the Borrowers and Guarantors breached both the loan and guaranty agreements, and are therefore in default.  NMAC further asserts that all of plaintiffs' affirmative defenses are waived by the "absolute and unconditional" language in the guaranty.  It thus maintains that it has established a <u>prima facie</u> right to enforce the guaranty agreements, as well as to foreclosure.   It has presented evidence supporting damages in the amount of $37,099.207.20.

In opposition, plaintiffs make four arguments: 1) that NMAC's motion is premature; 2) that there is a material question of fact as to whether plaintiffs were in breach; 3) that NMAC's damages estimate is not based on admissible evidence; and 4) that it has various affirmative defenses—including, <u>inter alia</u>, fraudulent inducement.

Because the Court finds no material question of fact as to plaintiffs' breach, and because the language of the guaranties is unambiguous, binding, and absolute, the Court agrees with defendant.  The Court does, however, require supplemental briefing as to the quantum of damages.

### A.  <u>The Guaranties</u>

As discussed above, defendant must make a three-pronged showing in order to obtain summary judgment to enforce a written guaranty.  First, it must prove

and absolute and unconditional guaranty.  Second, it must prove the underlying

debt.  Third, it must show that guarantor has failed to perform under the guaranty.

136 Field Point Circle, 644 Fed. App'x at 11–12.  The Court discusses each in turn.

       1.  Absolute and Unconditional

Each of the continuing guaranties contains the following provision:  "The

obligations of Guarantor under this Guaranty shall be continuing, absolute, and

unconditional under any and all circumstances and shall be paid by Guarantor

regardless of . . . any defense, offset or counterclaim . . . ."

Under New York state law, the inclusion of this provision bars plaintiffs from

asserting, as they attempt to do here, any affirmative defenses.  136 Field Point

Circle, 644 Fed. App'x at 12; Cooperative Centrale, 36 N.E.3d at 86.  Plaintiffs'

assertions that, for example, "BNF Partners and White Plains never would have

executed the October 2017 Cross-Agreement and Mortgage if not for the promise

that a $3 million loan was forthcoming" are therefore unavailing.

The cases cited by plaintiffs are inapposite; indeed, they refer to guaranties

that are neither continuing nor incorporate the "absolute and unconditional"

language employed here and regularly interpreted under New York law as barring

affirmative defenses.[10]

---

[10] Flexi-Van Leasing. Inc. v. Isaias, 23 F. Supp. 2d 419 (S.D.N.Y. 1998), for example, is cited for the
proposition that boilerplate waivers in guaranties are limited to the agreement containing them.
However, the Flexi-Van Court in fact states that whether a guaranty shall be considered
"continuing" will depend upon whether the plain meaning of the guaranty "clearly imports a
continuing liability."  Id. at 423.  As the plain language of the guaranties at issue here state clearly
the continuing liability, Flexi-Van and the other cases cited are easily distinguishable.

The cross-guaranties each incorporate, via the Schedule B attached, each and every provision of the continuing guaranties, including, importantly, the "absolute and unconditional" clause.  Accordingly, plaintiffs' affirmative defenses fail as a matter of law.

2.  <u>Underlying Debt</u>

Attached to each cross-guaranty is a Schedule A, which details plaintiffs' debts to Nissan—including the WSAs, Flom, Nilva, and Boyko's continuing guaranties, the revolving credit lines, the capital loans, the promissory note, and the mortgage.  Thus, plaintiffs' debt is repeatedly acknowledged by all parties by virtue of the signatures attached to the cross-guaranties.  (ECF Nos. 395-32, 395-33. 395-34, 395-95, 394-96.)  There is no triable issue, therefore, as to the existence of the underlying debt.

3.  <u>Guarantor's Failure to Perform</u>

The parties' principal argument as to whether there was a breach revolves around: 1) which set of pleadings is operative; and therefore 2) whether judicial admissions were made in plaintiffs' and third-party defendants' answers admitting the breach.  Plaintiffs and third party-defendants maintain that they amended their answers so as to make any earlier admissions inadmissible, and furthermore argue that they were taken out of context.  For its part, defendant points to plaintiffs' and third-party defendants' answers at ECF No. 169–178, noting that each contains numerous admissions that, for example, "ACIM and ALIM sold certain vehicles out

of trust." (See, e.g., ECF No. 169 ¶ 34.)  The Court agrees with defendant—there is no triable issue as to breach of the WSAs.

On December 1, 2017, the Court granted defendants' motions to strike plaintiffs' amended counterclaims and answers at ECF No. 362 and 363.  Thus, the former answers stand; in each of these answers, plaintiffs admitted to selling vehicles out of trust.  (ECF Nos. 169–78.)

In addition, in Flom's affidavit in opposition to summary judgment, he states that dealerships were selling vehicles out of trust.  That he asserts that the numbers are "grossly inflated," and/or that White Plains sold out of trust based on capital needs at the other dealerships does not remedy the fact that the dealership sold out of trust—a clear breach of the WSAs.

Thus, this Court finds no triable issue as to whether plaintiffs breached the terms of the contract.

NMAC has made the required three-pronged showing to enforce the guaranties; plaintiffs, for their part, have not raised any triable issues in response. Therefore, defendant has established its right to recover under the guaranties and the underlying loans.[11]  Accordingly, the Court GRANTS summary judgment to NMAC on Count Four.

---

[11] Plaintiffs' argument that defendants' motion is premature is similarly unavailing.  As the Court finds a breach based merely on the answers and affidavits, and interprets the language of the guarantees to bar plaintiffs' affirmative defenses, no further discovery is necessary.

B.  <u>The Mortgage</u>

In order to show a right to foreclosure under New York state law, the movant must produce: 1) the mortgage documents; and 2) undisputed evidence of nonpayment.  <u>Freidus</u>, 769 F. Supp. at 1277.

NMAC has easily met this standard and plaintiffs have not produced evidence to the contrary.  NMAC has produced the mortgage documents—the Note and Mortgage—and evidence of nonpayment in the demands for payment and notices of default.  As the Promissory Note and Mortgage are both included in the cross-guaranties, they, too were in default at the time plaintiffs defaulted on the WSAs.  Therefore, plaintiffs' argument that issues of fact remain on the mortgage is plainly wrong.  Any affirmative defenses are foreclosed by the absolute and unconditional guaranties.  The Court therefore GRANTS summary judgment to NMAC on Count Seven.

C.  <u>Damages</u>

Plaintiffs assert that defendant has failed to satisfy its burden of demonstrating the quantum of damages.  In support of its motion, defendant has proffered an affidavit from Randy Brooks, NMAC's Inventory Manager.  (ECF No. 395.)  Plaintiffs argue that the Brooks affidavit is inadmissible for a host of reasons, including, <u>inter alia</u>, that it is not based on personal knowledge, and that it is lacking in detail.  Plaintiffs do not, however, challenge particular numbers or assert

an alternate amount of damages.  Defendants maintain that the affidavit is admissible and based on business records.

The Brooks affidavit merely states, however, that he "instructed NMAC personnel to advise [him] of the outstanding amounts owed by Obligors (principal and interest) on the loans extended and unpaid."  (<u>Id.</u> ¶ 24.)  He further states that he "instructed NMAC personnel to inform [him] of the amounts expended in enforcing the Loan and Guaranty Agreements." (<u>Id.</u>) He then lists costs totaling $37,099.207.20.  (<u>Id.</u>)  However, he attaches no underlying documents—for example bills from attorneys, or payments to security companies—but merely recites the totals.  The Court agrees with plaintiffs that damages cannot be awarded on such a cursory showing.

The Court therefore ORDERS defendant to submit supplemental briefing and documentation as to the damages requested **not later than Wednesday, May 16, 2018.**  Plaintiffs shall have until **Wednesday, May 23, 2018** to file any opposition.

IV.     CONCLUSION

For the reasons set forth above, the Court GRANTS summary judgment to NMAC on Counts Four and Seven.  The Court further ORDERS supplemental briefing on damages.  The Clerk of Court shall terminate the motion at ECF No. 392.

SO ORDERED.

Dated:        New York, New York
              May 8, 2018

                                        _____
                                             KATHERINE B. FORREST
                                             United States District Judge