USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 11, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
        :
IN RE NISSAN LITIGATION        :    17-cv-729 (KBF)
        :
        :    <u>OPINION & ORDER</u>
        :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

On May 8, 2018, the Court found plaintiffs and third-party defendants liable for breach of loan and guarantee agreements and for foreclosure on their mortgages. (<u>See</u> ECF No. 462). As a result, the Court granted summary judgment to Nissan Motor Acceptance Corporation ("NMAC") on its substantive claims. (<u>See id.</u>) The sole remaining issue is the amount of damages due to NMAC, an issue which NMAC and plaintiffs submitted additional briefing on.

For the reasons set forth below, the Court GRANTS NMAC's motion for damages in the amount of $40,183,836.19.

I.    BACKGROUND

The facts and procedural history relevant to this decision are set out in the Court's previous summary judgment order. (<u>See id.</u>) A summary of the relevant portions is included here.

A. The Parties

This action began with a complaint filed by Acim NY, LLC d/b/a Nissan of Manhattan ("Acim"), Alim NY, LLC d/b/a Infiniti of Manhattan ("Alim"), and Bicom NY, LLC, d/b/a Jaguar Land Rover Manhattan ("Bicom"), against Nissan North America, Inc. ("NNA") and NMAC (collectively, "Nissan") for breach of contract in state court. (See id.) Nissan in turn filed counterclaims against Acim, Alim, and several third-party defendant dealerships and owners (including White Plains Auto Company, LLC, d/b/a White Plains Nissan ("WP"), and MTKN, LLC, d/b/a Nissan of Mt. Kisco ("MTKN")), claiming that the dealerships and their guarantors were in default on certain loan obligations to Nissan. (See ECF No. 348.)

Plaintiffs and third-party defendants are car dealerships and their owners, managers, and guarantors. Acim, Alim, WP, and MTKN are dealerships (collectively, "the Dealerships"). BNF Partners NY, LLC ("BNF") and BNF Realty, LLC ("BNF Realty") are the umbrella partnerships affiliated with the four dealerships. They are also parties in the litigation. BNF is comprised of three partners: third-party defendants Gary Flom, Veniamin Nilva, and Alexander Boyko. (See ECF No. 462.)

Defendants are NNA and NMAC. NNA sells both Nissan and Infiniti vehicles to franchised Nissan and Infiniti dealers throughout the United States. NMAC operates as NNA's captive finance arm. NMAC provides "wholesale" or "floor plan financing," whereby it establishes wholesale credit lines and provides purchaser money financing to allow dealers to acquire in-store inventory for retail

2

sale to the public. NMAC also extends working capital, mortgage loans, and revolving lines of credit to finance dealerships' construction of new premises.

B. The Contracts

By November 2015, Nissan and plaintiffs entered into a series of agreements to establish and build new Nissan and Infiniti dealerships in Manhattan. These agreements included three types of contracts between the parties.

First, NMAC and the Dealerships signed wholesale finance and security agreements (WSAs) that provided floorplan financing. (See ECF Nos. 394-2, 394-10, 394-17, 394-22.) The language of the four WSAs is nearly identical.

Second, NMAC, plaintiffs, and third-party defendants entered into various working capital and mortgage loans and revolving lines of credit in order to construct the new premises. These arrangements included:

- Three Revolving Credit and Security Agreements ("RLOCs"), consisting of a $2 million line of credit to Acim dated December 4, 2015, a $6 million line of credit also to Acim and also dated December 4, 2015, and a $7 million line of credit to Alim dated October 7, 2016 (see ECF Nos. 394-3, 394-11, 394-12);

- A Capital Loan and Security Agreement signed by NMAC and Alim, dated July 20, 2016, for a $3 million term loan (see ECF No. 394-4); and

- A $12 million loan by NMAC to BNF Realty in exchange for a Promissory Note dated October 7, 2016 (see ECF No. 394-28) and secured by a mortgage on a property in Tarrytown, New York.

3

Third, BNF Partners, Flom, Nilva, and Boyko (collectively, "the Guarantors") signed guarantee agreements to induce NMAC to extend credit to the Dealerships. These agreements guaranteed the "full and prompt performance and payment of all present and future liabilities of Dealer to Lender irrespective of their nature or the time they arise." (ECF Nos. 394-5, 394-6, 394-7, 394-9, 394-13, 394-14, 394-15, 394-18, 394-19, 394-20, 394-24, 394-25, 394-26.) The documents that made up these guaranties included:

- The Continuing Guaranties (ECF Nos. 394-5, 394-6, 394-7, 394-9, 394-13, 394-14, 394-15, 394-18, 394-19, 394-20, 394-24, 394-25, 394-26);
- A Guaranty Agreement (ECF No. 394-30); and
- A series of Cross-Guaranty Agreements between December 4, 2015, and October 7, 2016, each of which amended the previous agreement (ECF Nos. 395-32, 395-33, 395-34, 395-35, 394-36), and the final of which was executed by NMAC as the Lender; BNF Realty, WP, Acim, Alim, and MTKN, as the Borrowers; and Bicom, BNF Partners, WP, Flom, Nilva, and Boyko, as Guarantors[1] (ECF No. 394-36).

C. Procedural Background

On May 8, 2018, the Court granted summary judgment to NMAC on Counts Four and Seven of its Amended Counterclaim. (See ECF No. 462.) In granting

---

[1] As previously noted (see ECF No. 462), the fourth amended and restated cross-guaranty, cross-collateral, and cross-default agreement was not signed by Alexander Boyko. Boyko's signature, however, appears on all previous cross-guaranties. In response to this motion, he argues that he was often given blank signature pages unattached to the cross-guaranties. This argument is unavailing. Under New York law, "one who signs a note with obvious blanks is liable to a holder in due course of the note, according to the terms of the note after the blanks have been filled." Indem. Ins. Co. of N. America v. Am. Deseret Ltd. P'ship, 887 F. Supp. 521, 530 (S.D.N.Y. 1993).

summary judgment to NMAC, the Court found that there was "no triable issue as to whether plaintiffs breached the terms of the [WSAs]," and held that NMAC "established its right to recover under the guaranties and the underlying loans." (Id.)  The Court also held that NMAC had met its burden to establish a right to foreclose on the mortgages that secured the loans NMAC had provided.  (See id.)

This order left only one Count (Count Six relating to damages and fees) unresolved, as NMAC had withdrawn all the other remaining claims as moot.  (See id.)  The Court ordered supplemental briefing on the damages issue.  (See id.)  In response, NMAC submitted briefing, affidavits, and declarations on damages.  (See ECF Nos. 471, 472, 473, 479.)  Plaintiffs and third-party defendants submitted briefing, but no affidavits or declarations.  (See ECF No. 476.)

## II. LEGAL PRINCIPLES

### A. Summary Judgment

Summary judgment may not be granted unless a movant shows, based on admissible record evidence, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322–23.

5

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, citations, and alterations omitted). In addition, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted).

B. Contractual Damages

Under New York law, "[o]ne who violates his contract with another is liable for all the direct and proximate damages which result from the violation." Nat'l Market Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (quoting Wakeman v. Wheeler & Wilson Mfg. Co., 4 N.E. 264 (N.Y. 1886)). As a general matter, "[u]nder New York law, damages for breach of contract should put the [non-breaching party] in the same economic position he would have occupied had the

breaching party performed the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003).

Because the Court has already determined that NMAC met its burden to prove a breach of contract (see ECF No. 462), at this stage, under New York law, NMAC "need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks and citation omitted). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." Id. at 111 (quoting Entis v. Atl. Wire & Cable Corp., 335 F.2d 759, 763 (2d Cir. 1964)). "The rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only such reasonable certainty as serves as a basis for the ordinary conduct of human affairs." 36 N.Y. Jur. 2d Damages § 12 (2016) (footnotes omitted).

  C. Attorney's Fees

Since the decision to award attorneys' fees is a matter of substantive state law, the law of the forum state—here, New York—controls the analysis in diversity cases. RLS Assocs., LLC v. United Bank of Kuwait PLC, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006) (discussing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), doctrine and collecting cases).

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is

7

enforceable if the contractual language is sufficiently clear." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008) (citations omitted); see also Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 904 (N.Y. 1989) (explaining that under New York law, "attorney's fees are incidents of litigation and a prevailing party may not collect from the loser unless an award is authorized by an agreement between the parties, statute, or court rule").

In order to determine an appropriate fee award, courts typically start with a determination of the lodestar amount, which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Healey v. Leavitt, 458 F.3d 63, 71 (2d Cir. 2007) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). The Supreme Court has established a "strong presumption that the lodestar represents the reasonable fee." City of Burlington v. Dague, 505 U.S. 557, 562 (1992) (internal quotations omitted). "The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009) (internal quotations omitted).

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. "In order to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials." McDonald ex rel. Prendergast v. Pension Plan of

the NYSA-ILA Pension Tr. Fund, 450 F.3d 91, 96 (2d Cir. 2006); see also Scott v. City of N.Y., 626 F.3d 130, 132 (2d Cir. 2010).

A reasonable hourly rate is based on "the [current] prevailing market rate for lawyers in the district in which the ruling court sits." Anthony v. Franklin First Fin., Ltd., 844 F. Supp. 2d 504, 507 (S.D.N.Y. 2012). "A court may determine the reasonable hourly rate by relying both on 'its own knowledge of comparable rates charged by lawyers in the district,' as well as on 'evidence proffered by the parties.'" Adorno v. Port Authority of N.Y. & N.J., 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010) (citing Morris v. Eversley, 343 F. Supp. 2d 234, 245 (S.D.N.Y. 2004); Farbotko v. Clinton County of N.Y., 433 F.3d 204, 209 (2d Cir. 2005)).

In determining the proper number of hours for which the prevailing party should be compensated, "the district court should exclude excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." Quarantino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1997). The Court must "examine[ ] the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case." Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir. 1997).

D. Costs

Under Federal Rule of Civil Procedure 54(d)(1), a prevailing party is entitled to the costs of the suit. These costs include: "(1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for

exemplification and the costs of making copies of any material where the copies are necessarily obtained for use in the case; (5) docket fees under [28 U.S.C. § 1923]; and (6) compensation of court-appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under [28 U.S.C. § 1828]." 28 U.S.C. § 1920; see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 298 (2006).

In this District, certain costs associated with transcripts, depositions, witness fees, copying, docket fees, and other miscellaneous fees are also explicitly taxable for the prevailing party. See Local Rule 54.1.

III. DISCUSSION

Because the Court finds no material question of fact as to the damages owned to NMAC, the Court agrees with NMAC that it has met its burden to support an award of damages at this stage. NMAC is entitled to, all together, $40,183,836.19 in contractual damages, attorneys' fees, and costs.

A. Contractual Damages

Plaintiffs and third-party defendants do not argue that NMAC is not entitled to contractual damages. Nor could they. As the Court already found, the plaintiffs have repeatedly acknowledged the underlying debt, which the key contracts explicitly provide recovery for. (See ECF No. 462.) For example, the WSAs provide: "The security interest granted under this Agreement shall secure, in addition to all other sums of money due under this Agreement, the repayment of all costs of

collection and enforcement and all amounts spent by NMAC on behalf of Dealer."
(ECF Nos. 394-2, 394-10, 394-17, 394-22.)

Still, as before, plaintiffs and third-party defendants again assert that defendant has failed to satisfy its burden of demonstrating the quantum of damages. But, also as before, plaintiffs "do not . . . challenge particular numbers or assert an alternate amount of damages." (ECF No. 462.) In fact, plaintiffs and third-party defendants submitted no new evidence related to damages at all. NMAC, by contrast, provided detailed breakdowns of the damages it seeks and attached underlying documents that detail the calculations of the damage amount. (See ECF No. 471, 472, 473.)

In support of its request for contractual damages, NMAC submitted two affidavits from NMAC employees: a supplemental affidavit of Randy Brooks, the Inventory Manager for NMAC (see ECF No. 471), and an affidavit from Michael Lirot, a Dealer Workout Analyst in the Special Credit Department at NMAC (see ECF No. 472). These affidavits, along with the previously submitted material, supports an award to NMAC of its proposed damages for three related reasons.

First, both affidavits and the accompanying exhibits are properly admissible as business records. See Fed. R. Evid. 803(6). Both Brooks and Lirot declared, in effect, that the records were "kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record]." United States v. Komasa, 767 F.3d 151, 156 (2d Cir. 2014) (internal quotation marks and citation omitted.) As custodians of the documents, Brooks and

11

Lirot "need not have personal knowledge of the actual creation of the document to lay a proper foundation." Id. (internal quotation marks and citation omitted). Instead, these business records are admissible in light of Brooks and Lirot's declaration "that the records are integrated into [NMAC's] records and relied upon in its day-to-day operations." In re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir. 1981) (admitting bank records that "were of a type regularly used by the Bank in making decisions whether or not to extend credit"). Using an automated process to create the records does not render the documents inadmissible under Rule 803(6) and does not mean that a computer software expert must testify as to the automation used to create the business records. See Komasa, 767 F.3d at 156.

Second, because these affidavits and exhibits are admissible, they can support an award of damages at this stage if they establish an adequate and undisputed basis for an award of damages under New York law. The affidavits and exhibits meet that standard because they provide "a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." Tractebel Energy Marketing, 487 F.3d at 110 (internal quotation marks and citation omitted).

The admissible evidence of NMAC's damages include:

- The Brooks affidavit, which separates the requested damages into 17 separate categories, each of which is explained in the affidavit and supported by underlying documents (see ECF No. 471-1, Ex. A); and

- The Lirot affidavit (see ECF No. 472), which includes:

- An explanation of the source of the loan documents provided to the Dealerships and Guarantors;
- Invoices, emails, spreadsheets, and screenshots of internal accounting systems that track the loan payments and outstanding amounts; and
- Spreadsheets of the floorplan vehicles bought back and auctioned by NMAC.

These properly admitted business records support NMAC's proposed damages related to the unpaid mortgages and the Floor Plan financing because they reveal the source of each category of damages and the documented amount included in each category.

Third, plaintiffs and third-party defendants do not create a "genuine dispute" as to any of NMAC's evidence. See Fed. R. Civ. P. 56(a). They do not present any new evidence at all, thus failing to create a material dispute through the admission of opposing evidence. Instead, they argue that additional discovery is necessary because each number in the affidavit is not accompanied by all the necessary documentation and by an explanation of the calculation methodology used to arrive at the number. (See ECF No. 476.) But to create a genuine dispute, plaintiffs and third-party defendants must cite specific materials or explain why the evidence needed to challenge NMAC's evidence is unavailable. See Fed R. Civ. P. 56(c)(1). They failed to do so.

13

Nor are their arguments for why NMAC's evidence is insufficient (and thus why they need additional discovery) persuasive. More specifically, they fail to create a triable question as to the calculation of the mortgage interest, the customer waiver calculations, the cost of "keepers" and security at the dealerships, and the title fees NMAC paid. On the cost of the customer waiver calculations, the cost of the keepers, and the cost of security, NMAC provided, for each category:

- An affidavit reciting the total cost (see EFC No. 472 ¶¶ 63 (keepers), 66 (customer waivers), 67 (security fees));
- A spreadsheet of payments that add up to the total cost whenever there were multiple payments listed in the total cost (see ECF Nos. 472-21, Ex. U (keepers), 472-23, Ex. W (customer waivers)); and
- An illustrative set of material that backs up the spreadsheet of payments, including an illustrative weekly timesheet for a keeper, including daily lodging and meal costs (see ECF No. 472-22, Ex. V), redacted invoices and cancelled checks given to customers (see ECF No. 472-24, Ex. X), and an invoice of the payment made to the security firm (see ECF No. 472-25, Ex. Y).

On the title costs, NMAC admits that it cannot find the records that underlie the estimate for title fees given by employee responsible for tracking title fee costs. (See ECF No. 472 ¶ 68). But NMAC provides the estimate written by the employee responsible for the title costs, as well as receipts for title costs paid more recently. (See ECF No. 472-26, Ex. 2.)

14

Still, plaintiffs and third-party defendants argue that this evidence is insufficient. They assert that they need every document that underlies every number, all the way down to each individual receipt for every transaction. But they cannot create a triable issue of fact simply by stating that the Court should not award damages without every single underlying record without giving a reasonable explanation for why the extensive documentation already provided in the form of admissible evidence is, in their view, flawed. They do not, for example, submit an affidavit of a manager of the Dealership claiming that she never saw keepers or security guards at her Dealership; a list of average keeper fees in the area that calls NMAC's documented rates into doubt; or a declaration of a customer saying they never received a refund that NMAC claims was issued. Nor do they assert that such evidence would be unavailable if they looked for it. See Fed. R. Civ. P. 56(d). Without such evidence or an argument for why it is unavailable, plaintiffs and third-party defendants have not created a genuine factual dispute and are not entitled to additional discovery.

In sum, plaintiffs acknowledge that they owe debts to NMAC and that they signed contracts that provide for damages. They seek to avoid payment of those damages, but do not raise any triable issue regarding the reasonability of NMAC's proposed and well-documented damages. For this reason, the Court finds that it is proper to award NMAC the full contractual damages they seek.

### B. Attorneys' Fees and Costs

#### 1. Provision of Attorneys' Fees

Award of attorneys' fees to NMAC is appropriate here because, as New York law requires, each of the three sets of documents containing the contracts between NMAC, the Dealerships, and the Guarantors explicitly and clearly provide for the recovery of attorneys' fees by NMAC. See NetJets Aviation, 537 F.3d at 175; Hooper Assocs., 548 N.E.2d at 904.

First, each of the WSAs provide:

> If there is a default, Dealer shall pay all costs and expenses, <u>including NMAC's attorneys fees and in house counsel fees at prevailing rates</u>, in connection with: . . . (iii) collecting amounts due under this Agreement; and/or (iv) enforcing its rights under this Agreement . . . .

(ECF Nos. 394-2, 394-10, 394-17, 394-22.)

Second, each of the loan documents provide for attorneys' fees paid by the plaintiffs and third-party defendants. The three RLOCs each include a section that states:

> Borrower shall reimburse Lender for all costs and expenses, <u>including without limitation reasonable attorneys' fees and disbursements (and fees and disbursements of Lender's in-house counsel)</u> expended or incurred by Lender in any . . . legal action . . . in connection with (a) the negotiation, preparation, amendment, interpretation and enforcement of the Loan Documents . . . (b) collecting any sum which becomes due Lender under any Loan Document, (c) any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal, or (d) the protection, preservation or enforcement of any rights of the Lender."

(ECF Nos. 394-3, 394-11, 394-12 (emphasis added).) The Capital Loan and Security Agreement states:

16

> If Borrower shall fail to make any payment or perform any act required by this Agreement, IFS [Infini Financial Services] may . . . make such payment or perform such act for the account and at the expense of Borrower, without notice to or demand upon Borrower and without waiving or releasing any obligation or default. <u>Borrower shall indemnify and hold harmless IFS from and against all losses and expenses (including, but not limited to, reasonable attorneys' fees)</u> suffered or incurred by IFS by reason of any acts performed by it pursuant to this Section . . .

(ECF No. 394-4 (emphasis added).)

Third, the guarantees all provide for attorneys' fees. The Continuing Guaranties provide:

> If any legal action or actions are instituted by Lender to enforce any of its rights against Guarantor hereunder, <u>then Guarantor agrees to pay Lender all expenses incurred by Lender relative to such legal action or actions including, but not limited to, court costs plus reasonable attorneys' fees.</u>

(ECF Nos. 394-5, 394-6, 394-7, 394-9, 394-13, 394-14, 394-15, 394-18, 394-19, 394-20, 394-24, 394-25, 394-26 (emphasis added).) The Guaranty Agreement provides:

> <u>Guarantor agrees to pay to Lender, on demand, all costs and expenses, including attorneys' fees</u>, incurred by Lender in exercising any right, power or remedy conferred by this Guaranty or any other Loan Document signed by Guarantor, or in the enforcement of this Guaranty or any other Loan Document signed by Guarantor, whether or not any action is filed in connection therewith.

(ECF No. 394-30 (emphasis added).) The final of the series of Cross-Guarantee Agreements provides:

> If any legal action or actions are instituted by Lender [NMAC] to enforce any of its rights against Guarantor under the Guaranties, then Guarantor agrees to pay Lender all expenses incurred by Lender relative to such legal action or actions including, but not limited to, court costs plus reasonable attorneys' fees.

(See ECF No. 394-36.)

In sum, in all three of these sets of contracts, the language in both of these sets of contracts is sufficiently clear to allow recovery of attorneys' fees in this case.

2. Amount of Attorneys' Fees

The amount of the attorneys' fees that NMAC seeks is reasonable because it arises from a reasonable number of hours spent on litigation multiplied by a reasonable hourly rate. See Healey, 458 F.3d at 71. NMAC submitted a declaration by a lawyer from the law firm representing NMAC in this litigation. The declaration details the hours and rates of the lawyers assigned to this case. (See ECF No. 473.) The Court finds the hourly rates included in that declaration, which range from $200 to $340, are reasonable for the level of complexity in this case. (See id.) The Court also finds that the hours included in the declaration are reasonable, particularly given that this case has already "generated countless motions, a mountain of briefing" and by now, over 500 docket entries. (ECF No. 462.)

Furthermore, plaintiffs and third-party defendants' specific objections to the attorneys' fees fail for two reasons. First, plaintiffs and third-party defendants rely merely on speculation as to the impropriety of NMAC's proposed attorneys' fees—they again provide no documents. They argue that NMAC's redaction of some of its time logs may hide excessive fees and therefore that "the Court should refuse to award any fees for the redacted entries." (See ECF No. 476.) They also argue that the allegedly duplicative and vague entries warrant "at least a 50% reduction in fees." (See id.) But they do not provide any concrete evidence in support of their

argument that all of the redacted entries and half of all other entries should be removed in calculating fees. NMAC, by contrast, provided hundreds of pages of information related to its attorneys' fees, including hourly accounting for each lawyer assigned to the case. (See, e.g., ECF No. 473-1.) Plaintiffs' and third-party defendants' speculation, even accompanied with a recommendation to cut the fees in half, is insufficient to create a genuine issue of material fact and thus is insufficient to overcome award of attorneys' fees at this stage. See Hicks, 593 F.3d at 166.

Second, plaintiffs and third-party defendants argue that NMAC committed a number of procedural errors. They argue that NMAC must submit a formal motion for attorneys' fees and costs. But a formal motion is not required when the attorneys' fees are provided for in the contracts, as they are here, and where the request for attorneys' fees was included in the initial prayer for relief. (See ECF No. 348.) Plaintiffs and third-party defendants also argue that NMAC cannot collect fees in this action from the other, related actions that NMAC litigated against them. But because all of the actions included in the proposed damages "involved a core of facts and related legal theories common to all the claims advanced," it is proper to award fees in all the actions directly related to this case. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir. 1996) (internal quotation marks omitted; see also Kerin v. U.S. Postal Serv., 218 F.3d 185, 195–96 (2d Cir. 2000) (court can "rely on any conduct that is sufficiently related to the underlying litigation in awarding attorneys' fees for the entire action").

In short, the Court has reviewed the attorneys' fees that NMAC requested and finds them reasonable. Plaintiff and third-party defendants fail to raise any material dispute as to the reasonableness of those fees, making summary judgment appropriate.

3. Costs

NMAC submitted to the Court a bill of costs along with supporting documentation. (See ECF No. 473.) Because NMAC is a prevailing party and plaintiffs and third-party defendants fail to raise any plausible challenge to the costs charged, the Court awards costs to NMAC.

IV. CONCLUSION

For the reasons set forth above, the Court GRANTS NMAC's motion for damages. Pursuant to this Court's previous rulings, NMAC is entitled to damages in the amount of $40,183,836.19.

The Clerk of Court is directed to enter judgment in accordance with this Order and this Court's previous Opinion & Order, dated May 8, 2018 (ECF No. 462). The Clerk of Court is also directed to terminate this action with regard to NMAC.

SO ORDERED.

Dated: New York, New York
September 11, 2018

KATHERINE B. FORREST
United States District Judge