UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
ACIM NY, L.L.C. d/b/a Nissan of Manhattan, :
ALIM NY, L.L.C. d/b/a Infiniti of Manhattan, :
and BICOM NY, LLC d/b/a Jaguar Land Rover :
Manhattan, :
 :
       Plaintiffs/Counter Defendants, :
 :
    - against - :
 :
NISSAN NORTH AMERICA, INC. and :
NISSAN MOTOR ACCEPTANCE CORP., :
 :
       Defendants/Counter Claimants. :
-------------------------------------------------------------- X
NISSAN MOTOR ACCEPTANCE CORP., :
 :
       Third-Party Plaintiff, :
 :
    - against - :
 :
BNF NY REALTY, LLC, :
BNF PARTNERS NY, LLC, :
MTKN, LLC d/b/a Nissan of Mt. Kisco; :
WHITE PLAINS AUTO COMPANY, LLC :
   d/b/a White Plains Nissan, :
GARY B. FLOM, :
ALEXANDER A. BOYKO, and :
VENIAMIN NILVA, :
 :
       Third-Party Defendants. :
-------------------------------------------------------------- X
NISSAN NORTH AMERICA, INC., :
 :
       Third-Party Plaintiff, :
 :
    - against - :
 :
GARY B. FLOM, :
ALEXANDER A. BOYKO, and :
VENIAMIN NILVA, :
 :
       Third-Party Defendants. :
-------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/26/2019

17 Civ. 729 (LGS)

**OPINION AND ORDER**

Third-Party Action No.: 1

Third-Party Action No.: 2

LORNA G. SCHOFIELD, District Judge:

This is a breach of contract case between Nissan North America, Inc. ("NNA") and two affiliated car dealerships (ACIM NY, LLC ("ACIM") and ALIM NY, LLC ("ALIM"), collectively, "Manhattan") and their owners Alexander Boyko, Veniamin Nilva and Gary Flom (collectively with Manhattan, "Dealers"). NNA moves for summary judgment on all remaining claims asserted against it by Manhattan, and on all of its counterclaims and third-party claims against Dealers. For the reasons discussed below, summary judgment is granted to NNA on all of Manhattan's remaining claims against NNA and denied without prejudice to renewal on all of NNA's remaining counterclaims and third-party claims against Manhattan and Dealers respectively.

I. BACKGROUND

A. The Parties' Agreements

The following facts are taken from the parties' submissions on this motion and previous judicial decisions in this case of which the Court takes judicial notice.

NNA markets and distributes motor vehicles under the "Nissan" brand name through a nationwide network of independently owned and operated dealers. Infiniti is a division of NNA, and markets and distributes motor vehicles under the "Infiniti" brand name through a similar dealer network. To become an authorized Nissan or Infiniti dealer, a dealer must execute a Dealer Sales and Service Agreement, commonly known in the industry as a "dealer agreement."

Nissan Motor Acceptance Corporation ("NMAC") is an automotive financial services company. Among other things, NMAC provides floor plan financing, which enables dealers to acquire in-store inventory for retail sale to the public.

On November 17, 2015, NNA entered into a Nissan dealer agreement with ACIM and an Infiniti dealer agreement with ALIM (the "Dealer Agreements").  By their terms, the Dealer Agreements could be terminated upon Manhattan's insolvency, failure to maintain floor plan financing or failure to conduct dealership operations for seven consecutive days.  The Dealer Agreements also contain several introductory recitals (the "Recitals"), including:

> Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the Consuming public.
>
> Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Manufacturer, Dealer or [Nissan/Infiniti] Products and shall engage in no discourteous, deceptive, misleading or unethical practices or activities.

NNA and Dealers also entered into the "Additional Agreement."  Pursuant to the Additional Agreement, NNA agreed to provide financial assistance for Manhattan's establishment of Nissan and Infiniti dealerships at a new flagship facility (the "787 Property").  The Additional Agreement includes a release provision (the "Release Provision") which provides, in relevant part:

> [Dealers] . . . release[] and forever discharge[] NNA . . . from all claims, demands, rights, causes of action, damages, liabilities, costs, or expenses (including attorneys' fees) which [Dealers] have or might have or acquire, whether known or unknown, actual or contingent, as of the date of the execution of [the Additional Agreement], which arise from, are related to, or associated in any with, directly or indirectly, . . . the establishment, ownership and/or operation of any NNA dealership . . . .

On October 7, 2016, NMAC and ALIM entered into a Revolving Credit and Security Agreement (the "RLOC"), pursuant to which NMAC agreed to extend a $7 million revolving line of credit for leasehold improvements of the 787 Property (the "$7 Million Revolver").  Among the RLOC's provisions is an integration clause (the "Integration Clause") which provides:

> The Loan Documents [i.e., the RLOC] are intended by the parties as the final expression of their agreement, contain the entire agreement between the parties, and supersede all earlier understandings or agreements concerning this Agreement.

### B. Manhattan's Financial Difficulties

In 2016, NMAC terminated Manhattan's wholesale financing agreements due to the sale of vehicles "out of trust" at an affiliated dealership. *See In re Nissan Litig.*, 2018 WL 2113228, at *4 (S.D.N.Y. May 8, 2018). A dealer sells out of trust when it fails to repay a captive lender funds advanced for inventory sold.

In January 2017, Manhattan filed the Complaint, which stated that Manhattan was "[o]perating at a significant loss," and was "nearly out of cash" and in "financial distress." In February 2017, the information management system used by Manhattan to process repair orders and warranty claims was shut off due to lack of payment to the system vendor. Manhattan began to turn away customers who sought to service their vehicles at the dealerships. Since February 2017, neither ACIM nor ALIM have sold a new Nissan or Infiniti vehicle to a retail customer.

In March 2017, ACIM and ALIM surrendered their remaining new-vehicle inventories to NMAC. On March 8, 2017, NNA notified Manhattan of its intention to terminate the Dealer Agreements pursuant to New York's Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. § 460, *et seq.* (the "Dealer Act").

### C. Manhattan's Claims against NNA and NNA's Counterclaims and Third-Party Claims against Dealers

The Complaint sets forth various theories of recovery, but the claims rest primarily on three principal allegations.

First, the Complaint alleges that Manhattan expected to inherit a list of customers (the "Customer List") who were formerly served by the area's previous Nissan/Infiniti dealership (the

"Prior Dealership"). NNA allegedly refused to provide the Customer List to Manhattan or to inform the customers on the Customer List that Manhattan was open for business.

Second, the Complaint alleges that during negotiations, NNA concealed from Manhattan that most of the Prior Dealership's retail sales were "brokered sales." Brokered sales are large-volume sales to middle-men at steep discounts and are generally unprofitable.

Third, the Complaint alleges that, in response to Manhattan's financial difficulties, NNA promised to provide Manhattan with a $3 million working capital loan and a $4 million revolving line of credit through NMAC. NNA allegedly reneged on its commitment to provide the working capital loan, and offered the $7 Million Revolver instead.

NNA asserts five counterclaims against Dealers for breach of contract based on Dealers' alleged non-compliance with various agreements, including the Dealer Agreements and Additional Agreement. NNA also seeks a declaratory judgment that it may terminate the Dealer Agreements.

### D. Procedural History

The relevant pleadings on this motion are Manhattan's Complaint against NNA and NMAC (Dkt. No. 1-1) and NNA's Second Amended Counterclaims and Third-Party Complaint against Dealers ("SACTPC") (Dkt. No. 347). Manhattan's remaining claims in the Complaint are Counts One, Two, Three, Five and Seven against NNA alone, and Count Four against NNA and NMAC.[1] NNA's remaining counterclaims and third-party claims are Counts One through Five as to liability and damages, and Count Six only as to NNA's damages.

---

[1] For purposes of this motion, the Court assumes that Count Four of the Complaint is still asserted against NMAC. On May 8, 2018, the Court granted summary judgment to NMAC on Counts Four and Seven of its Amended Counterclaim. On September 11, 2018, the Court granted NMAC's motion for damages. The September 11 Order, which resolved the sole remaining count of NMAC's Amended Counterclaim, directed the Clerk of Court to terminate

5

## II. STANDARD

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

The court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 255; *accord Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (citations omitted). When the movant has properly supported its motion with evidentiary materials, the opposing party may only establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original); *accord Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 408 (S.D.N.Y. 2018).

---

NMAC from the action. The Court did not, however, resolve Count Four of the Complaint, which asserts a Dealer Act claim against NMAC. NMAC need not be restored to this action, however, because the Court grants summary judgment to NNA/NMAC on Count Four.

## III. DISCUSSION

### A. Manhattan's Claims against NNA

#### 1. Count One -- Breach of Contract

Manhattan's breach of contract claim is based on NNA's alleged reneging on its commitments to provide Manhattan with the Customer List and a working capital loan. Manhattan asserts that these actions constitute a breach of the Recitals, which appear in the "Introduction" section of the Dealer Agreements.

As a threshold matter, the Dealer Agreements, which contain a California choice-of-law provision, are governed by California law. Federal courts sitting in diversity generally apply the choice-of-law rules of the forum state, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *accord Christian v. TransPerfect Glob., Inc.*, 17 Civ. 5554, 2018 WL 4571674, at *4 (S.D.N.Y. Sept. 24, 2018), and "New York law gives full effect to the parties' choice-of-law provisions." *Dins v. Nationstar Mortg., LLC*, No. 16 Civ. 2943, 2017 WL 570941, at *3 (S.D.N.Y. Feb. 13, 2017) (quoting *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)).

Manhattan argues that NNA "has never raised the choice-of-law issue to date, and thus has waived the right to claim California law controls." While it is true that a choice-of-law issue not raised until the late stages of a case may be deemed waived, "[w]hat constitutes a 'late stage' is somewhat flexible." *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 423 (S.D.N.Y. 2014). "[W]here, as here, the issue to be raised is purely legal, and where, as here, the party seeking to enforce waiver does not argue or show that it has been prejudiced by the late argument," a choice-of-law issue may be raised on a motion for summary judgment. *See id.* Also, the parties here had notice of the applicable law, as they signed an agreement providing for it. NNA did not waive its contractual right to have California law apply.

7

Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011); *accord Freska Produce, Int'l LLC v. Alejandro Produce, Inc.*, 18 Civ. 1205, 2019 WL 157682, at *3 (S.D. Cal. Jan. 10, 2019). As noted, the relevant "breach" in this case is of the Recitals contained in the Introduction to the Dealership Agreements.

The Recitals do not create binding legal obligations on the part of NNA, and therefore cannot form the basis for a breach of contract claim. "Since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement." *Powertech Tech., Inc. v. Tessera, Inc.*, No. 10 Civ. 945, 2013 WL 12324116, at *10 (N.D. Cal. Apr. 15, 2013) (citations omitted). "The law has long distinguished between a 'covenant' which creates legal rights and obligations, and a 'mere recital' which a party inserts for his or her own reasons into a contractual instrument. Recitals are given limited effect even as between the parties." *Emeryville Redevelopment v. Harcros Pigments, Inc.*, 101 Cal. App. 4th 1083, 1101 (1st Dist. 2002); *accord Guardian Media Techs., Ltd. v. Sears, Roebuck, and Co.*, No. 14 Civ. 767, 2014 WL 12588283, at *7 (C.D. Cal. July 9, 2014).

Manhattan argues that the use of the word "shall"[2] indicates that the Recitals give rise to a contractual obligation. This argument is unavailing for two reasons. First, the recital referring

---

[2] The Recitals provide, in relevant part:
> Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the Consuming public.
> Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Manufacturer,

8

to NNA's "integrity and expressed intention to deal fairly" does not contain the word "shall." Second, the recital that does contain the word "shall" must be read in its full context. *See Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 977 (E.D. Cal. 2018) ("[L]anguage in a contract must be construed in the context of that instrument as a whole . . . ."); *Logan v. Union Sec. Ins. Co.*, 14 Civ. 1174, 2015 WL 3745047, at *11 (C.D. Cal. Mar. 31, 2015) ("[C]ontracts should be interpreted to be 'internally consistent.'" (quoting *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979))). The Recitals *precede*, not follow, the clause: "To achieve the purposes referred to above, Seller and Dealer agree as follows . . . ." To interpret the Recitals as creating binding commitments would require disregarding the plain language of the contract, which clearly states that the agreed-upon terms *follow* the Recitals. Moreover, adopting Manhattan's construction would jettison the contract's language characterizing the Recitals as "purposes." The resulting interpretation would render the parties' agreement internally inconsistent, if not outright contradictory. *Cf. Golden W. Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 37, 37 n.25 (4th Dist. 1994) (finding that a purported recital created a binding obligation where it included the language: "It is understood and agreed . . . ."). Accordingly, no fact issue exists regarding the issue of whether NNA breached the Dealership Agreements, because the Recitals are not binding as a matter of law. NNA is entitled to summary judgment on Count One of the Complaint.

### 2. Count Two -- Breach of Implied Covenant of Good Faith and Fair Dealing

Manhattan grounds its claim for breach of the implied covenant of good faith and fair dealing in three factual predicates: (1) NNA's alleged concealing of the issues regarding the

---

Dealer or [Nissan/Infiniti] Products and shall engage in no discourteous, deceptive, misleading or unethical practices or activities.

9

Customer List and brokered sales during negotiations, (2) NNA's alleged refusal to provide Dealers with the Customer List or to refer customers of the Prior Dealership to Manhattan and (3) NNA's alleged reneging on its commitment to provide Manhattan with a working capital loan. Even assuming their truth, none of these factual predicates is sufficient as a matter of law to establish breach of the implied covenant of good faith and fair dealing.

### a. Customer List and brokered sales

NNA's alleged conduct regarding the Customer List and brokered sales cannot give rise to liability on the part of NNA due to the Release Provision,[3] which states:

> Each of the Dealer Parties . . . releases and forever discharges NNA . . . from all claims, demands, rights, causes of action, damages, liabilities, costs, or expenses (including attorneys' fees) which the Releasing Parties have or might have or acquire, whether known or unknown, actual or contingent, as of the date of the execution of this Financial Intervention Agreement, which arise from, are related to, or associated in any with, directly or indirectly, . . . the establishment, ownership and/or operation of any NNA dealership . . . .

The "Dealer Parties" include Manhattan. The Customer List and brokered sales are "related to . . . the establishment . . . and/or operation" of ACIM and ALIM, and accordingly cannot serve as the predicate for a claim against NNA. *See Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) ("Under New York law . . . a valid release constitutes a complete bar to an action on a claim which is the subject of the release." (citations and quotation marks omitted)); *accord Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, 681 Fed. App'x 64, 66 (2d Cir. 2017) (summary order).

Manhattan argues that the Release Provision bars claims only for breach of the Additional Agreement. This argument is undermined by the plain language of the Release

---

[3] As discussed above, the Release Provision is part of the Additional Agreement. The Additional Agreement contains a New York choice-of-law clause.

Provision, which provides that Dealers released all claims related to "the establishment, ownership and/or operation of any NNA dealership." A contractual provision "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 91 N.E.3d 1186, 1193 (N.Y. 2017) (quoting *Marin v. Constitution Realty, LLC*, 71 N.E.3d 530, 534 (N.Y. 2017)).

Manhattan argues that the Release Provision is invalid under § 463(2)(l) of the Dealer Act, which provides:

> It shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract . . . [t]o require a franchised motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed under this article, provided that this paragraph shall not be construed to prevent a franchised motor vehicle dealer from entering into a valid release or settlement agreement with a franchisor.

N.Y. Veh. & Traf. Law § 463(2)(l). But § 463(2)(l) does not apply to the Release Provision insofar as it bars Manhattan's contract claims. By its terms, § 463(2)(l) applies only to releases "which would relieve any person from liability *imposed under this article*" -- that is, under the Dealer Act. § 463(2)(l) (emphasis added). It does not prohibit valid releases from other liability.

Manhattan argues that the Release Provision is unenforceable because a "waiver . . . will not be given effect where the facts are peculiarly within the knowledge of the party invoking it." But that principle applies to disclaimers of reliance on a representation. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 155 (2d Cir. 1995) (internal quotation marks omitted); *accord Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, 15 Civ. 4428, 2018 WL 4278286, at *26 (S.D.N.Y. Mar. 26, 2018). The Release Provision is not

11

a non-reliance clause, so the "peculiar knowledge" exception does not apply. The arguments and authorities cited by Manhattan concerning non-reliance and integration clauses are inapposite.[4]

### b. Working capital loan

There are also no material issues of fact regarding NNA's obligation to provide Manhattan with a $3 million working capital loan. As discussed, NMAC and ALIM entered into the RLOC, pursuant to which NMAC provided the $7 Million Revolver for leasehold improvements of the 787 Property. Dealers assert that in so doing, NNA reneged on its previous agreement to provide a $4 million revolving line of credit and a separate $3 million capital loan in breach of the implied covenant of good faith and fair dealing.

This assertion is foreclosed by the Integration Clause, which provides: "The Loan Documents are intended by the parties as the final expression of their agreement, contain the entire agreement between the parties, *and supersede all earlier understandings or agreements concerning this Agreement*." Because the Integration Clause "clearly states its superseding effect . . . it would be unreasonable for [Manhattan] to believe otherwise." *Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d 343, 359 (S.D.N.Y. 2018). There can be no reasonable dispute that the Integration Clause, "which included express, unambiguous language as to [its] superseding effect, [was] in fact intended to supersede conflicting portions of all prior agreements." *See id.*

Manhattan argues that the Integration Clause is ineffective because it does not specifically disclaim reliance on the disputed representations. But, as each of the cases cited by

---

[4] Paragraph 3 of the Additional Agreement provides that Dealers "are relying upon their own evaluation and business plan in entering into . . . any Dealer Agreement . . . and not on any representation, promise, agreement or information provided by NNA." This provision is irrelevant. Dealers released their claims related to the Customer List and brokered sales under the Release Provision, not Paragraph 3 of the Additional Agreement.

12

Manhattan makes clear, this rule applies only to claims sounding in *fraud*. *See, e.g.*, *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 340 (S.D.N.Y. 2005) ("[A] party to a fully integrated contract can assert a claim of *fraud*, unless the contract specifically disclaims reliance on the representations at issue." (emphasis added)); *Mikada Grp., LLC v. T.G. Nickel & Assocs., LLC*, No. 13 Civ. 8259, 2014 WL 7323420, at *10 (S.D.N.Y. Dec. 19, 2014) ("Notwithstanding any general merger clause, an 'omnibus statement' disclaiming reliance on any oral representation does not preclude a claim for *fraud* in the inducement in New York." (emphasis added)); *CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, No. 14 Civ. 3600, 2014 WL 6674480, at *4 (S.D.N.Y. Nov. 25, 2014) (same); *Nielsen Co. (US), LLC v. Success Sys., Inc.*, No. 11 Civ. 2939, 2013 WL 1197857, at *8 (S.D.N.Y. Mar. 19, 2013) (same). Count Two asserts a breach of the covenant of good faith and fair dealing, not fraud. Accordingly, no specific disclaimer is necessary to make the integration clause effective.[5]

Manhattan also asserts that an integration clause cannot cover non-parties to the underlying agreement. This is not categorically the case. Under New York law, integration clauses can cover non-parties who function, for purposes of a transaction, as part of the same entity expressly covered by the integration clause. *See Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707, 2008 WL 4840880, at *7 (S.D.N.Y. Nov. 5, 2008) (distinguishing New York cases where a non-party functions as a "mere broker" of an agreement from cases where a non-

---

[5] In its surreply, Manhattan asserts that integration clauses require specificity even outside of the fraud context, citing *Philips Lighting Co. v. Schneider*, No. 05 Civ. 4820, 2008 WL 4527713 (E.D.N.Y. Sept. 30, 2008). This argument fails. The court in *Philips* stated that specificity is required to waive a defense pursuant to an "absolute and unconditional" guaranty, not an integration clause. *See id.* at *4. This distinction is crucial; the court in *Philips* stated that in assessing the applicability of an absolute and unconditional guaranty to an affirmative defense, "the touchstone is specificity." *See id.* (quoting *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993)).

party functions as a "corporate agent"); *see also Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 13 Civ. 5586, 2014 WL 6466994, at *11 (S.D.N.Y. Nov. 18, 2014) (a defendant who is an "intended beneficiary" or who "otherwise was acting as a corporate agent" may have standing to invoke a merger clause, apparently applying New York law); *compare Harmit Realties LLC v. 835 Ave. of the Americas, L.P.*, 23 N.Y.S.3d 230, 231 (1st Dep't 2016) (integration clause covering realty company extends to non-party acting as managing member of the firm) *with In re WorldCom, Inc.*, 374 B.R. 94, 109 (Bankr. S.D.N.Y. 2007) ("MCI has argued that it was not involved in the sale of LTI . . . . MCI cannot rely on the Integration Clause with respect to the alleged representations made by its in-house attorneys [on behalf of MCI].").

This is just such a case. Manhattan claims that it negotiated the credit agreement with NNA, who effectuated the agreement "*through* NNA's captive financing company, NMAC." In other words, the capital loan was a "promise[] by NNA to be fulfilled by NMAC." The Complaint alleges that NMAC's actions with respect to the working capital loan were "[a]t the direction of and for the benefit of NNA." In short, Manhattan's claims with respect to the $3 million capital loan rest on the premise that Manhattan had an agreement with NNA. Manhattan cannot now assert, solely for purposes of the Integration Clause, that NNA was not part of the agreement.

For these reasons, there is no material issue of fact regarding whether NNA breached the implied covenant of good faith and fair dealing, and NNA is entitled to summary judgment on Count Two of the Complaint.

### 3. Count Three -- Violation of Dealer Act § 463(2)(d) (Constructive Termination)

Count Three of the Complaint alleges that NNA violated § 463(2)(d) of the Dealer Act, which provides, in relevant part:

14

> It shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract:
>
> (1) To terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer except for due cause, regardless of the terms of the franchise. . . .
>
> (3) The provisions of subparagraphs one and two of this paragraph notwithstanding, a franchisor may terminate its franchise with a franchised motor vehicle dealer upon at least fifteen days written notice upon . . . the failure of the franchised motor vehicle dealer to conduct its customary sales and service operations for a continuous period of seven business days, except for acts of God or circumstances beyond the direct control of the franchised motor vehicle dealer .
> . . .

N.Y. Veh. & Traf. Law § 463(2)(d). Manhattan's constructive termination claim is based on: (1) NNA's alleged refusal to provide Manhattan with the Customer List or to notify the Prior Dealership's customers of Manhattan's opening, (2) NNA's alleged reneging on its promise to provide a working capital loan, (3) NMAC's termination of construction financing, which resulted in Dealers having to secure financing from other sources, (4) NNA's alleged refusal to negotiate any further resolutions and instructing Dealers to sell their franchises and (5) NNA's promising other dealers that NNA would terminate Dealers' franchises and flip the franchises and related assets to its selected replacements. These actions are insufficient to establish constructive termination as a matter of law.

First, NNA's refusal to provide Manhattan with the Customer List or to notify the Prior Dealership's customers cannot give rise to liability under the Dealer Act, because Manhattan released all claims "related to, or associated in any with, directly or indirectly, . . . the establishment, ownership and/or operation of any NNA dealership . . . ." Manhattan argues that this release is unlawful, citing § 463(2)(l) of the Dealer Act, which provides:

> It shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract . . . [t]o require a franchised motor vehicle dealer to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed under this article, provided that this paragraph shall not be

15

> construed to prevent a franchised motor vehicle dealer from entering into a valid release or settlement agreement with a franchisor.

N.Y. Veh. & Traf. Law § 463(2)(l). Manhattan asserts that § 463(2)(l) was intended to prevent franchisors from contracting out of liability, and renders the Release Provision void.

On the contrary, the plain language of § 463(2)(l) permits parties to contract out of Dealer Act liability, so long as they do so by means of a "*valid* release or settlement agreement." *Id.* (emphasis added). Under New York law, a release is valid if it is (1) "clear and unambiguous on its face" and (2) "knowingly and voluntarily entered into." *See Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 463 (2d Cir. 1998); *accord Merrill Lynch, Pierce, Fenner & Smith Inc.*, 681 Fed. App'x at 66. Here, the Release Provision, which releases NNA from claims "related to . . . the establishment, ownership and/or operation of [an] NNA dealership," is clear and unambiguous. The Release Provision was knowingly and voluntarily entered into; Manhattan acknowledged that it had "reviewed or had the opportunity to review [the Additional Agreement] with . . . their legal, tax, or other advisors, and are fully aware of all of their rights and alternatives." Moreover, Manhattan acknowledged that it was "not . . . required in any way to enter into [the Additional Agreement]" but rather entered into the agreement "free from any mental, physical, or economic duress or coercion of any kind." In view of these acknowledgments, the Release Provision is valid and effective under New York law. *See General Motors Corp. v. Villa Marin Chevrolet, Inc.*, Nos. 98 Civ. 5206, 98 Civ. 5208, 98 Civ. 6167 & 99 Civ. 3750, 2000 WL 271965, at *15 (E.D.N.Y. Mar. 7, 2000) (upholding, in a contract dispute between franchisor and dealer, the validity of a release provision in view of similar acknowledgements).

Manhattan cites *A.J. Temple Marble & Tile v. Union Carbide Marble Care*, 618 N.Y.S. 2d 155 (Sup. Ct. 1994), for the proposition that release and integration clauses in the franchise

16

context are unenforceable because the New York Legislature intended to "prevent a franchisor from contracting out of liability." *See id.* at 159. This argument is unavailing. The court in *A.J. Temple* was addressing not the Dealer Act, but the Franchise Sales Act, which makes unlawful any "release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article." N.Y. Gen. Bus. Law § 687(5). The Dealer Act, in contrast to the Franchise Sales Act, expressly provides that a dealer may enter into "a valid release or settlement agreement with a franchisor." N.Y. Veh. & Traf. Law § 463(2)(l).

Second, NNA's alleged reneging on its promise to provide Manhattan with a working capital loan also does not give rise to liability under the Dealer Act. As discussed above, this conduct is not actionable because the Integration Clause forecloses Manhattan from asserting that NNA had an obligation to provide the loan.

Third, none of NNA's other alleged actions rise to the level of a "constructive termination." Franchisors may be held liable on a constructive termination theory for actions that in effect terminate the parties' franchise agreement. *See, e.g.*, *Crest Cadillac Oldsmobile, Inc. v. General Motors Corp.*, No. 05 Civ. 51, 2005 WL 3591871, at *2 (N.D.N.Y. Dec. 30, 2005) (manufacturer's discontinuation of Oldsmobile line of cars could state a claim for constructive termination of plaintiff's Oldsmobile franchise); *Robert Basil Motors, Inc. v. General Motors Corp.*, No. 03 Civ. 315A, 2004 WL 1125164, at *5 (W.D.N.Y. Apr. 17, 2004) (same). None of NNA's alleged actions constitute such a termination. The termination of construction financing for the new 787 Property is not tantamount to terminating the parties' franchise agreement, even if Manhattan had to secure alternative financing at "usurious rates." Although some of NNA's alleged statements suggest that it was poised to terminate Dealers'

franchises, § 463(2)(d) applies to effective terminations of a franchise agreement, not contemplated ones.

That is not to say that NNA did not seek to terminate Dealers' franchises. It is uncontested that NNA sought to do so by means of a written termination notice. But Dealers do not premise their § 463(2)(d) claim on the unlawfulness of the written termination notice; rather, they chose to pursue a constructive termination theory based on separate conduct. That conduct does not constitute effective termination of the parties' franchise agreement.

For these reasons, NNA is entitled to summary judgment on Count Three of the Complaint.

### 4. Count Four -- Violation of Dealer Act § 463(2)(u) (Unlawful Conduct)

Count Four of the Complaint alleges that NNA violated § 463(2)(u) of the Dealer Act, which provides:

> It shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract . . . [t]o use any subsidiary corporation, affiliated corporation, captive finance source or any other controlled corporation, partnership, association or person to accomplish what would otherwise be unlawful conduct under this article on the part of the franchisor.

N.Y. Veh. & Traf. Law § 463(2)(u). The Complaint alleges that NNA caused NMAC to renege on its commitments to provide a working capital loan and its discontinuation of construction financing.

Even if NNA did so, NNA would not be in violation of § 463(2)(u), which prohibits franchisors from using a captive financing arm to engage in "otherwise . . . unlawful conduct under [the Dealer Act] on the part of the franchisor." Neither reneging on the working capital loan nor discontinuing construction financing is unlawful conduct under the Dealer Act if undertaken by NNA as a franchisor. As discussed above, Manhattan cannot enforce any commitment to provide a working capital loan because of the Integration Clause. Discontinuing

18

construction financing is similarly not actionable. Dealers' theory of liability is that halting the financing amounted to constructive termination in violation of the Dealer Act. As discussed above, NNA is not liable for constructive termination as a matter of law. Accordingly, there is no genuine issue of material fact regarding whether NNA violated § 463(2)(u) of the Dealer Act, and NNA is entitled to summary judgment on Count Four of the Complaint.

### 5. Count Five -- Promissory Estoppel

Count Five of the Complaint asserts a claim for promissory estoppel based on NNA's alleged promises to provide Dealers with a working capital loan. For the reasons discussed above, this conduct is not actionable due to the Integration Clause. *See End Line Inv'rs., Ltd. v. Wells Fargo Bank, N.A.*, No. 16 Civ. 7009, 2018 WL 3231649, at *6 (S.D.N.Y. Feb. 27, 2018) ("Integration clauses are generally fatal to promissory estoppel claims premised on parol evidence."); *Fariello v. Checkmate Holdings, LLC*, 918 N.Y.S.2d 408, 409 (1st Dep't 2011) ("The promissory estoppel cause of action was properly dismissed, since it was barred by the retainer agreement which explicitly set forth that the agreement contained the entire understanding of the parties."). NNA is entitled to summary judgment on Count Five of the Complaint.

### 6. Count Seven -- Fraudulent Inducement and Rescission

Count Seven of the Complaint asserts a claim for fraudulent inducement and rescission, based on NNA's alleged failure to disclose the extent of brokered sales and refusal to provide Manhattan with the Customer List. As discussed above, this conduct is not actionable because Manhattan released NNA "from all claims . . . related to, or associated in any with, directly or indirectly, . . . the establishment, ownership and/or operation of any NNA dealership . . . ." Accordingly, NNA is entitled to summary judgment on Count Seven of the Complaint.

### B. NNA's Counterclaims and Third-Party Claims against Dealers

NNA asserts counterclaims and third-party claims against Dealers for breach of contract and seeks a declaratory judgment that the Dealer Agreements may be terminated. Summary judgment is premature at this time, especially because discovery has not yet closed. Further discovery may create genuine issues of material fact with respect to Dealers' defenses including, *inter alia*, whether NNA caused Dealers' alleged contractual breaches and whether Boyko signed the documents purporting to contain his signature.

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Fed. R. Civ. P. 56(d)(1). The Court denies summary judgment on NNA's claims against Dealers without prejudice to renewal. If NNA seeks to renew its motion for summary judgment, it should do so after the close of all discovery so that the Court can adjudicate the motion on a full record.

## IV. CONCLUSION

For the foregoing reasons, NNA's motion for summary judgment is GRANTED as to Manhattan's claims against NNA and the Complaint is dismissed. Summary judgment is DENIED without prejudice to renewal as to NNA's counterclaims and third-party claims against Dealers. For clarity, the remaining claims in this case are: (1) Counts One through Five of NNA's SACTPC, as to liability and damages (Dkt. No. 347), (2) Count Six of the SACTPC as to damages only (Dkt. No. 347) and (3) Boyko's crossclaims against Flom and Nilva for indemnification and contribution (Dkt. Nos. 171 & 172).

Dated: February 26, 2019
New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**